934 F.2d 662
 21 Bankr.Ct.Dec. 1382, Bankr. L. Rep. P 74,117
 In re J.R. McCONNELL, Jr., Debtor.
Vincent BUSTAMANTE, Individually and d/b/a Vincent
Bustamante, Trustee, Appellant/Cross-Appellee,
v.
Peter JOHNSON, Trustee for J.R. McConnell, Jr.,
Appellee/Cross-Appellant.
 No. 90-2555.
 United States Court of Appeals,
Fifth Circuit.
 July 1, 1991.
 
 Richard L. Petronella, Houston, Tex., for appellant/cross-appellee.
 Daniel H. Johnston, Jr., Patricia A. Hancock, Baker, Brown, Sharman & Parker, Houston, Tex., for appellee/cross-appellant.
 Appeals from the United States District Court for the Southern District of Texas.
 Before GARZA, POLITZ, and JONES, Circuit Judges.
 EDITH H. JONES, Circuit Judge:
 
 
 1
 Peter Johnson, the trustee of the bankruptcy estate of J.R. McConnell, Jr., sued Vincent Bustamante to recover as a fraudulent transfer some $600,000 paid by McConnell to Bustamante in an attempt to purchase an apartment complex. 11 U.S.C. Sec. 548(a). The bankruptcy court entered judgment in favor of the Trustee for $101,000. On cross-appeals to the district court, the judgment was affirmed in its entirety. Both parties again appeal, and we affirm.
 
 
 2
 Bustamante owned the Ironwood I Apartments in Houston, Texas. In January 1986, he contracted with McConnell, since deceased, to sell the property for $819,000. The deal did not close on the appointed day in February; pursuant to their original contract, the parties four times extended the date of closing. To obtain each extension, McConnell deposited additional earnest money with Bustamante, the sum of which totalled $600,000. The final extended closing date was September 30, 1986, at which time McConnell defaulted on the contract. Bustamante retained the earnest money; McConnell was forced into bankruptcy the next month and later consented to an order of relief. During the summer of 1986, McConnell allegedly conspired with David Dabney to obtain a loan for over $1.5 million on the Ironwood property using a fraudulent title policy. Bustamante had no knowledge of the fraud at the time
 
 
 3
 The Trustee sued Bustamante to recover the $600,000 earnest money payments as a fraudulent transfer within the meaning of 11 U.S.C. Sec. 548(a). Bustamante sought an offset for the damages he had suffered as a result of the breach of contract. He sought an additional offset for damages he had allegedly sustained from a cloud on his title to Ironwood because of the fraudulent title policy. The bankruptcy court found that McConnell's payment of the $600,000 was a fraudulent transfer but that Bustamante was entitled to an offset of $499,000 for his contractual damages. The court allowed no offset for any tort damages relating to the title fraud. The district court affirmed.
 
 
 4
 Bustamante argues that the lower courts erred in finding a fraudulent transfer, in assigning too low a value to the contract price for purposes of assessing contractual damages, and in refusing to offset the Trustee's recovery with tort damages. The Trustee argues that the courts below erred in assigning too low a market value to the Ironwood property for purposes of assessing Bustamante's contractual damages. On appeal, we review the lower courts' conclusions of law de novo and their findings of fact under the clearly erroneous standard. Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1307-08 (5th Cir.1985) (per curiam).
 
 I.
 FRAUDULENT TRANSFER
 
 5
 Under Sec. 548(a)(2)(A) and (B)(i) of the Bankruptcy Code (11 U.S.C.), a transaction is fraudulent if it is 1) a transfer of the debtor's interest in property, 2) made within one year of the filing of the bankruptcy petition, 3) an exchange for which the debtor received less than a reasonably equivalent value, and 4) made while the debtor was insolvent. The Trustee may "avoid" such a transaction by recovering the property so transferred or its value.
 
 
 6
 Bustamante argues first that no "transfer" occurred. He states that "the Bankruptcy Court here determined that a transfer was made by McConnell to Bustamante upon the failure of the closing to occur." This determination assertedly conflicts with In re Wey, 854 F.2d 196, 199 (7th Cir.1988), which held that "what actually occurred when [the debtor] defaulted [on a contract to buy a hotel] was an extinguishment of his equitable interest in the hotel, not a transfer." Wey accordingly concluded that a debtor's forfeiture of a ten percent downpayment on the property was not a "transfer" under 11 U.S.C. Sec. 548 or Sec. 547, the latter provision dealing with preferences. It is difficult to interpret Wey, however, because the case is unclear. The opinion also seems to acknowledge that "the only transfer was [the debtor's] actual tendering of the down payment--an event which occurred well before the 90-day period [covered by Sec. 547]." 854 F.2d at 199 (emphasis added and footnote omitted). If tendering the down payment amounted to a "transfer," contrary to the earlier-quoted portion of the opinion, the court should have and did go farther, alternately finding that the debtor received, under Sec. 548, "reasonably equivalent value" for the forfeiture of his deposit. To the extent Wey holds that actual tender of the downpayment was a "transfer" subject to Sec. 548, we agree.
 
 
 7
 Bustamante argues next that the lower courts erred in concluding that McConnell did not receive "reasonably equivalent value" in exchange for the $600,000 and in placing the burden on Bustamante to disprove that fact.[1] He has analyzed the parties' contractual relations in four ways to demonstrate this point. Bustamante initially characterizes what McConnell received in exchange for the money as "the option to close the sale" or "contract rights," and he challenges the Trustee's proof that McConnell did not receive reasonably equivalent value for these rights. It seems self-evident, however, as the bankruptcy court found, that property worth only $320,000 at the last agreed closing date is not of a "reasonably equivalent" value for the $819,000 total purchase price or for the $600,000 already deposited by McConnell.
 
 
 8
 Bustamante also contends that McConnell never actually forfeited the right to purchase the property, because Bustamante remained willing to complete the sale long after September 30, 1986. Such unilateral magnanimity contradicts the contract terms and Texas law, which does not "convert" an earnest money contract into a contract for deed without the parties' express, mutual agreement. See, e.g., Southern Travelers' Ass'n v. Wright, 34 S.W.2d 823, 826 (Tex. Comm'n App.1931, holding approved). In any event, it would be an absurd construction of Sec. 548(a) to conclude that McConnell fraudulently transferred good money after bad in trying unsuccessfully to close the Ironwood I sale in a steadily declining market, but that he would not have fraudulently transferred his money if he had actually closed the deal and received property far less valuable than his purchase price.
 
 
 9
 Alternatively, if the $600,000 payment is characterized as a discharge of "liquidated damages" for breach of contract, then McConnell again did not receive reasonably equivalent value. As elaborated below, no Texas court would enforce a provision for liquidated damages of $600,000 for breach of an $819,000 real estate sales contract.
 
 
 10
 Yet another description of the transaction advanced by Bustamante is that the $600,000 payment discharged McConnell's "actual damages" for breach. Whether McConnell received a reasonably equivalent value then depends on the amount of liability he incurred in breaching the contract. If McConnell's liability was much less than $600,000, he did not receive reasonably equivalent value for the amount he "overpaid." Section 548(a) would allow the Trustee to recover the amount of that overpayment. The lower courts correctly followed this formulation. It remains to examine whether they correctly calculated McConnell's liability and the resulting judgment owed by Bustamante.
 
 II.
 MEASURE OF CONTRACTUAL DAMAGES
 
 11
 Ordinarily, the amount of the fraudulent transfer calculated by the trial court would represent a factual finding shielded by the clearly erroneous rule. Bustamante argues that the bankruptcy court incorrectly calculated the damages he suffered from McConnell's breach of contract. First, he asserts that paragraphs 9.2 and 9.7 of the contract allow him to retain the $600,000 of earnest money as liquidated damages.[2] The courts of Texas will enforce liquidated damages provisions only in certain circumstances:
 
 
 12
 [I]f the parties actually intended the provision to constitute their estimate of the damages that would actually be sustained by the party harmed by the breach, and the amount so fixed is a reasonable estimate of just compensation for the harm contemplated by the breach, and the amount of damages is incapable or hard to determine, it is enforceable.
 
 
 13
 Community Devel. Serv. v. Replacement Parts Mfg., 679 S.W.2d 721, 727 (Tex.Ct.App.1984); see also Stewart v. Basey, 150 Tex. 666, 669, 245 S.W.2d 484, 486 (1952). Even assuming that the parties intended the retention of earnest money to operate as liquidated damages rather than as a penalty, the amount McConnell ultimately paid ($600,000) was not "a reasonable estimate of just compensation" for the harm contemplated by McConnell's failure to close the sale. No reasonable person would have estimated, at the time of making the contract, either that $600,000 represented a reasonable liquidated damage amount in comparison to an $819,000 purchase price, or that the property McConnell was contracting to purchase would lose nearly 75% of its value in the time before closing. The provision allowing Bustamante to keep $600,000 if McConnell failed to buy Ironwood I for $819,000 was an unenforceable penalty.
 
 
 14
 In the absence of a valid liquidated damages clause, Texas courts fall back on the traditional measure of damages for breach of a promise to purchase property--contract price less market value at the time of the breach. Kempner v. Heidenheimer, 65 Tex. 587 (1886). The bankruptcy court found the market value of Ironwood I to be $320,000 on September 30, 1986, the date of McConnell's breach. (The Trustee claims this figure is too low; see Part IV below.) The court subtracted this amount from the contract price of $819,000 to yield damages of $499,000. Bustamante argues that although $819,000 was the price in January 1986, the price had increased by $59,607.24 to $878,607.24 on September 30, 1986. He cites paragraph 9.7 of the contract as providing for price increases of $258.04 per day from February 11 to September 30. ($258.04/day X 231 days = $59,607.24) In addition, as he observes, the Trustee employed the $878,607.24 price as correct in his own estimates of contract damages before the bankruptcy court.[3]
 
 
 15
 The Trustee responds that the last sentence of paragraph 9.7 provides that in case of McConnell's default, Bustamante "agrees that [retention of the earnest money] shall be [his] sole remedy and this provision [for $258.04 per day] shall not otherwise be enforceable." Technically, Bustamante is not attempting to "enforce" the provision. Rather, he is claiming it as a formula that fixes the contract price depending on the date of closing. As the Trustee put it in his trial memorandum in the bankruptcy court: "This figure was arrived at by negotiation and was to cover a loss of interest on the sales price, accruing taxes and continuing operating losses on the property."
 
 
 16
 The bankruptcy court did not discuss whether paragraph 9.7 influenced its calculation of damages. Reviewing that provision in light of the court's reasoning and the parties' arguments, however, we cannot say that the bankruptcy court clearly erred in its calculations or its legal conclusions. The automatic per diem increase does not bind the parties or the court, as it was intended to apply only if the sale closed. Pending closing, and after the sale failed to close, Bustamante presumably could have retained the $600,000 earnest money in an interest-bearing account and thus mitigated some of his delay damages. We are not prepared to say that the bankruptcy court's deviation of less than ten percent from Bustamante's preferred hypothetical sales price constituted clear error. Absent any other offset or reduction, the judgment for the Trustee at this point reflects the difference between the earnest money that Bustamante retained ($600,000) and the court's assessment of his contract damages that accrued when McConnell did not close ($499,000), yielding $101,000.
 
 III.
 OFFSET FOR TORT DAMAGES
 
 17
 In addition to an offset against the fraudulent transfer for contractual damages, Bustamante seeks an "offset for tort damages suffered because of McConnell's fraudulent loan transactions with Northwest Bank & Trust." He seeks this offset on the basis of Sec. 553(a) of the Bankruptcy Code, which "grants a creditor the right 'to offset a mutual debt owing by such creditor to the debtor' so long as both debts arose before the commencement of the bankruptcy action and are indeed mutual." In re Davidovich, 901 F.2d 1533, 1537 (10th Cir.1990) (per curiam). Section 553(a) setoffs, however, do not apply to actions by the Trustee to recover fraudulent transfers: "It would defeat the purpose of the Bankruptcy Act's provisions relating to fraudulent transfers to allow [creditors] to offset the value of the property thus transferred to them by the amount of their unsecured claim against [the debtor]." Mack v. Newton, 737 F.2d 1343, 1366 (5th Cir.1984).
 
 
 18
 If Bustamante is to offset the Trustee's recovery with McConnell's tort liability, he must satisfy the conditions for "recoupment," a rule that "has evolved to permit a creditor to offset a claim that 'arises from the same transaction as the debtor's claim,' without reliance on the setoff provisions and limitations of section 553." Davidovich, 901 F.2d at 1537. Recoupment "allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim." In re Holford, 896 F.2d 176, 178 (5th Cir.1990) (emphasis in original). Bustamante might thus assert recoupment based on the contract but not on an unrelated tort, consisting of McConnell's alleged conspiracy with one David Dabney to secure a fraudulent title policy on the Ironwood I project naming Dabney as owner. With this title policy, they took out a loan on the property secured by a mortgage to Northwest Bank & Trust. Bustamante seeks damages for having to defend against Northwest's attempted foreclosure and generally for suffering a cloud on his title to Ironwood I.
 
 
 19
 The bankruptcy court correctly refused to "offset" the $600,000 with these asserted tort damages. The contract and the alleged fraud did not arise out of the same transaction. Except that they both involved the same property, they were unrelated. Bustamante alleges no fraud in either the inducement or the execution of his Ironwood sales contract. Moreover, he does not allege that McConnell's fraud interfered with either party's performance of the contract. Cf. Davidovich, 901 F.2d at 1538 ("The fact that the same two parties are involved in the claims to be offset, and that a similar subject matter gave rise to both claims does not mean that the two arose from the 'same transaction' for purposes of the doctrine of recoupment."). As the bankruptcy court stated, Bustamante should be required to "present his claim in the bankruptcy case and obtain such satisfaction of it as is available to other similarly situated creditors."
 
 IV.
 PROPERTY VALUE AT DEFAULT
 
 20
 In his cross-appeal, the Trustee argues that the bankruptcy court was clearly erroneous in determining that Ironwood I had a market value of $320,000 on September 30, 1986. He claims that a payment of $775,000 by Ticor Title Co. to Northwest Bank & Trust in settlement of a claim on the fraudulent title policy procured by McConnell and Dabney is "conclusive" evidence of Ironwood's value. The bankruptcy court did not specifically refer to this evidence in her opinion, having been more impressed by other evidence of value, namely, the testimony of Bustamante and the appraisers called by each party. Weighing their opposing projections of apartment occupancy rates, deferred maintenance charges, and federal tax law changes--all in light of the sharp economic downturn Houston was undergoing in 1986--the court found the market value to be $320,000. From our remote appellate perch, we cannot say that the court's evaluation of the quality of this testimony was clearly erroneous.
 
 V.
 CONCLUSION
 
 21
 The bankruptcy court threaded its way carefully through this fraudulent conveyance case and, as we have concluded, did not err in its disposition. The judgments of the bankruptcy and district courts are therefore
 
 
 22
 AFFIRMED.
 
 
 
 [1]
 Bustamante and the Trustee both recognize that the trustee has the burden to prove the elements of a fraudulent transfer. In re Breuer, 68 B.R. 48, 50 (Bankr.N.D.Iowa 1985). The bankruptcy court's opinion, however, alludes at one point to Bustamante's failure to produce proof supporting his contentions about reasonably equivalent value. When we view this allusion in the context of the entire opinion, we are convinced that the court applied the correct standard
 
 
 [2]
 The Earnest Money Contract of January 1986 provided:
 
 
 [9]
 2 In the event the sale of the Subject Properties is not consummated due to default on the part of the Purchaser, then all Earnest Money and Additional Earnest Money, if any, shall be paid to the Seller by the Title Company as liquidated damages for Purchaser's default, as Seller's sole and exclusive remedy for any such default
 
 
 [9]
 7 If Purchaser elects to extend the time of closing ... for any reason other than that [relating to title defects], then Purchaser agrees to pay Seller, at closing, an amount equal to $258.04 per day for each day after February 11, 1986, that the closing does not occur.... If the closing does not occur because of a default on the part of the Purchaser, the Seller agrees that the damages under paragraph 9.2 shall be Seller's sole remedy and this provision shall not otherwise be enforceable
 
 
 [3]
 Also, the Trustee's trial memorandum contained these statements: "The contract purchase price is $819,000 plus $258.04 per day, from and after February 11, 1986.... As noted above, the Earnest Money Contract provided for an increase in the purchase price of $258.04 for each day that the closing was delayed beyond February 11, 1986."