**In Re John Richard SULLIVAN, Debtor.**

**A.M. MANCUSO, Trustee, Plaintiff,**

**v.**

**T. ISHIDA USA, INC., Defendant.**

**Bankruptcy No. 391–32099–HCA–11.
Adv. No. 392–3840.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Dec. 27, 1993.

---

James D. Jordan, Raymond J. Urbanik, Munsch Hardt Kopf Harr & Dinan, P.C., Dallas, TX, for A.M. Mancuso, Trustee.

Robert A. Milbank, Bartholow & Milbank, Paul E. Lokey, Paul E. Lokey & Co., Dallas, TX, for T. Ishida USA, Inc.

## MEMORANDUM OPINION

HAROLD C. ABRAMSON, Bankruptcy Judge.

In the above-captioned adversary proceeding ("Adversary"), the postconfirmation trustee for the estate of John R. Sullivan seeks to avoid an allegedly fraudulent prepetition transfer of a lien on certain real estate to T. Ishida USA, Inc. ("Ishida"). The Adversary came on for trial on the 28th day of October, 1993.

This Court has jurisdiction over the Adversary under 11 U.S.C. §§ 544 and 548; 28 U.S.C. §§ 1334 and 157(b)(2)(H) and (O); and Article 13 of the Trustee's Second Amended Plan of Reorganization as modified by the Trustee's Revised Second Amended Modifications, entered by this Court on March 13, 1992.[1]

## Facts

John R. Sullivan is a Dallas businessman who was involved in myriad real estate ventures in the 1980s. At the end of that decade Mr. Sullivan, along with so many of his contemporaries in the real estate development business, found the value of his holdings to be declining. By January 31, 1990, Mr. Sullivan's internal accounting records showed that his liabilities exceeded his assets by nearly $69 million.

One of Mr. Sullivan's wholly owned corporations, Property Asset Equity Corporation ("PAEC"), owned a well-located piece of North Dallas real estate called Meadows North. NCNB Texas National Bank ("NCNB") held a deed-of-trust lien on Meadows North and, in the summer of 1990, posted the property for foreclosure. The outstanding debt to NCNB at that time was about $1,643,400. Mr. Sullivan believed NCNB would bid less than that at the foreclosure sale and assert a large deficiency against Mr. Sullivan personally,[2] so he began to arrange refinancing. He obtained a loan commitment for $1,400,000 from National Realty Advisors, but he needed more to retire the NCNB debt.

Mr. Sullivan turned to Ishida, a company with which he had done business in the past, for the rest of the money he needed to save Meadows North. Because Mr. Sullivan could not qualify for a loan,[3] he arranged for a family trust to borrow the money from Ishida and buy Meadows North at the foreclosure

---

1. Article 13 of the Trustee's Second Amended Plan of Reorganization as modified by the Trustee's Revised Second Amended Modifications, entered by this Court on March 13, 1992, reads, in pertinent part: "The Court shall retain and have exclusive jurisdiction over the Estate and the Bankruptcy Case for the following purposes: * * * (f) To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan; * * * [and] (i) To determine such other matters as may be set forth in the Order of Confirmation or which may arise in connection with the Plan or Order of Confirmation."

2. Mr. Sullivan had guaranteed the NCNB loan.

3. Mr. Sullivan testified at trial that the reason he could not qualify for a loan in August 1990 was not insolvency or financial problems; it was the fact that he was embroiled in litigation with financial institutions at the time.

sale. Ishida agreed to lend $400,000 to the Korbel Trust if Mr. Sullivan would provide both a personal guaranty and a lien on some previously unencumbered property. Mr. Sullivan signed the guaranty and offered as security a parcel of Aspen, Colorado, real estate known as the Star Mountain Ranch, which Mr. Sullivan then owned free and clear of any liens.

On August 3, 1990, the trustee of the Korbel Trust, James Howard, signed a promissory note to Ishida in the amount of $400,000. Mr. Sullivan signed a deed of trust to grant Ishida a first lien on Star Mountain Ranch. Mr. Sullivan also signed a letter agreement with Mr. Howard providing that, in consideration for Mr. Sullivan's guaranty of the Ishida loan, Mr. Howard would pay Mr. Sullivan a $50,000 fee, "payable from the sale or proceeds of the Meadows North property" ("Accommodation Fee"). On August 6, 1990, Ishida wire-transferred $400,000 from its bank account to Korbel Trust's bank account.

The foreclosure sale of Meadows North took place the following day, August 7, 1990. A different Sullivan family trust, the Sherwood Trust, submitted the high bid of $1,643,400 to buy Meadows North. (Apparently the designation of *Korbel* Trust as the borrower in the Ishida deal either had been a mistake or was deliberately revised, and Ishida was later sent a set of replacement documents naming Sherwood Trust as the borrower.)

Mr. Sullivan filed his Chapter 11 bankruptcy petition less than a year after the Ishida loan transaction, on February 1, 1991. His schedules showed that his liabilities exceeded his assets by more than $127 million on the petition date.

A liquidating plan of reorganization was confirmed by this Court on March 13, 1992. That plan appointed a postconfirmation trustee, A.M. Mancuso ("Trustee"), to oversee the liquidation and pursue various causes of action on behalf of the creditors. In October 1992, the Trustee sold the Star Mountain Ranch for $1,222,000. The Trustee distributed some of that money to Mr. Sullivan's creditors but, because Ishida asserted a first lien on the sale proceeds, kept $600,000 in an escrow account pending resolution of this Adversary.

### The Fraudulent Conveyance Action

On December 22, 1992, the Trustee filed a complaint against Ishida ("Complaint"), initiating this Adversary. The Complaint alleges that the Trustee can avoid Mr. Sullivan's transfer of the deed-of-trust lien on Star Mountain Ranch to Ishida because the transfer was a fraudulent conveyance under 11 U.S.C. § 548(a)(1) and (2).[4] The Trustee also asserts that he can avoid the lien under 11 U.S.C. § 544(b)[5] in conjunction with §§ 24.005(a) and 24.006(a) of the Texas Business and Commerce Code.[6]

---

**4.** 11 U.S.C. § 548(a) reads:

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining

with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

**5.** 11 U.S.C. § 544(b) reads:

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

**6.** The relevant portions of the referenced sections of the Texas Business and Commerce Code read:

§ 24.005. Transfers Fraudulent as to Present and Future Creditors

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether

Ishida does not dispute the fact that the transfer of the Star Mountain Ranch lien to Ishida was a transfer of "an interest of the debtor in property" or that the transfer occurred within one year before the date of Mr. Sullivan's bankruptcy filing. However, Ishida asserts that Mr. Sullivan did not intend to hinder, delay, or defraud his creditors; that Mr. Sullivan received a reasonably equivalent value in exchange for the transfer; and that Mr. Sullivan was not insolvent on the date of the transfer.

■ The Trustee bears the burden of proving all elements of a fraudulent transfer. *Besing v. Hawthorne (Matter of Besing)*, 981 F.2d 1488, 1494 (5th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993), citing *Bustamante v. Johnson (In re McConnell)*, 934 F.2d 662, 665 n. 1 (5th Cir. 1991).

***Actual fraud: 11 U.S.C. § 548(a)(1) and Tex.Bus. & Com.Code § 24.005(a)(1)***

Mr. Sullivan's transfer of the Star Mountain Ranch lien may be avoided by the Trustee if the transfer was made "with actual intent to hinder, delay, or defraud" Mr. Sullivan's present or future creditors.[7]

***Quantum of proof.***—Several courts have held that actual intent to defraud a creditor must be proven by clear and convincing evidence. *See, e.g., Sommers v. Sorce (In re Major Funding Corp.)*, 126 B.R. 504, 508 (Bankr.S.D.Tex.1990) (Letitia Z. Clark, B.J.); *Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 726 (D.Md.1989), *aff'd*, 912 F.2d 464 (4th Cir.1990). However, in 1991 the United States Supreme Court decided that the pre-

ponderance standard, rather than the clear and convincing standard, is the correct quantum of proof required of plaintiffs in dischargeability actions under 11 U.S.C. § ˊ523. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991). After *Grogan*, the Bankruptcy Appellate Panel of the Ninth Circuit Court of Appeals opined: "A fair reading of [*Grogan* ] leads to the inference that the preponderance standard applies in all bankruptcy proceedings grounded in allegations of fraud." *Western Wire Works, Inc. v. Lawler (In re Lawler)*, 141 B.R. 425, 428 (9th Cir. BAP 1992).

■ The Fifth Circuit has not decided, post-*Grogan,* what the correct quantum of proof should be in fraudulent conveyance actions. However, the Fifth Circuit recently noted—and followed—an apparent trend towards using a preponderance standard unless Congress specifically prescribes some other standard or unless some particularly important individual interest is at stake (*e.g.,* a constitutional "liberty" interest). *Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises, Ltd., II (Matter of Briscoe Enterprises, Ltd., II)*, 994 F.2d 1160, 1164–65 (5th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993) (concluding that "preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."). Section 548 of the Bankruptcy Code, like § 1129 discussed in *Briscoe,* is silent regarding the quantum of proof. Like *Briscoe,* this case, in which the Trustee seeks to avoid Ishida's lien, is "solely about money," 994 F.2d at 1165, and does not implicate any individual's

---

the creditor's claim arose within a reasonable time before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

  (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

  (B) intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

§ 24.006. Transfers Fraudulent as to Present Creditors

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

7. 11 U.S.C. § 548(a)(1); 11 U.S.C. § 544(b), TEX. BUS. & COM CODE § 24.005.

liberty or quasi-liberty interests. Therefore, this Court will use the preponderance of the evidence standard in determining whether the Trustee has proven "actual intent to hinder, delay, or defraud." [8]

■ *Facts regarding actual intent to defraud.*—"Due to the difficulty in proving intent to defraud, it may be implied from circumstances surrounding the transaction." *Sommers v. Sorce (In re Major Funding Corp.)*, 126 B.R. 504, 508 (Bankr.S.D.Tex. 1990). Although the Court may make inferences from the objective facts surrounding the transfer, such as the traditional "badges of fraud," [9] the Court cannot find intent without also making a "subjective evaluation of the debtor's motive." *Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 484 (4th Cir.1992).

The Trustee argues that various facts support an inference of actual intent to defraud creditors. First the Trustee argues that Mr. Sullivan pledged a portion of the value of Star Mountain Ranch to Ishida because he wanted to keep that value out of the bankruptcy estate. The parties stipulated, however, that the reason Mr. Sullivan gave Ishida the lien on Star Mountain Ranch was Ishida's refusal to extend credit on any other terms, and the Trustee offered no evidence to the contrary at trial.

Second, the Trustee points out that Mr. Sullivan failed to list his guaranty of the Ishida note on his original bankruptcy schedules and that Mr. Sullivan's disclosure of the Star Mountain Ranch lien on the schedules was "misleading" because it suggested that the Accommodation Fee had already been paid to Mr. Sullivan.[10] These observations are offered to support the Trustee's theory that Mr. Sullivan intended to deprive his creditors of at least part of the value of the Star Mountain Ranch by concealing from them the true nature of the Ishida loan transaction and its ultimate beneficiary, *i.e.*, Sherwood Trust. However, the fact that Mr. Sullivan did disclose the lien transfer and the correct date of that transfer on his original schedules is inconsistent with that theory.[11]

Finally, the Trustee describes a transaction in 1993 wherein Starwood Partners I, an entity owned by Mr. Sullivan's brother, acquired Ishida's note and lien on Star Mountain Ranch, essentially in exchange for Sherwood Trust's conveying another, unrelated asset to Ishida. Sherwood Trust then paid Starwood $30,000 in exchange for Starwood's

**8.** *Contra Bumgardner v. Ross (In re Ste. Jan–Marie, Inc.)*, 151 B.R. 984, 987 (Bankr.S.D.Fla. 1993) (requiring, post-*Grogan*, clear and convincing evidence of actual intent to defraud under 11 U.S.C. § 548(a)(1)). The *Ste. Jan–Marie* case does not discuss *Grogan*.

**9.** *See, e.g.,* Tex.Bus. & Com.Code § 24.005(b): "In determining actual intent [to hinder, delay, or defraud any creditor of the debtor], consideration may be given, among other factors, to whether:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

**10.** Exhibit G to Mr. Sullivan's original Statement of Financial Affairs states: "On August 7, 1990, John R. Sullivan pledged a 66 acre tract of undeveloped land located in Pitkin County, Colorado partially to secure a $400,000 loan to a third party, for an accommodation fee and subrogation rights."

**11.** The Court offers no opinion whatsoever as to whether Mr. Sullivan's disclosure of the Ishida/Star Mountain Ranch transaction on his bankruptcy schedules is sufficient to survive attack under 11 U.S.C. § 727(a)(4). The Court's discussion of Mr. Sullivan's bankruptcy schedules relates *only* to the question of whether the circumstances, taken as a whole, support an inference that Mr. Sullivan intended to hinder, delay, or defraud his creditors by transferring a lien on the Star Mountain Ranch to Ishida in August 1990.

agreement not to seek further payments from Sherwood Trust. The net effect of this transaction was that the Sullivan family paid off Ishida and tried to substitute itself into Ishida's position to defend the Star Mountain Ranch proceeds against attack by the Trustee in this Adversary. Whatever the reasons for this maneuver may have been, it occurred three years after the events at issue in this litigation (*i.e.*, those of August 1990) and several months after the Trustee initiated the Adversary. It could not have affected any of Mr. Sullivan's creditors other than Ishida and simply is not probative of Mr. Sullivan's intentions in August 1990.

*Conclusion.*—The Trustee has not met his burden of proving, by a preponderance of the evidence, that Mr. Sullivan intended to hinder, delay, or defraud creditors by engaging in the Ishida transaction in August 1990. The Court finds that Mr. Sullivan's actual intent in August 1990 was to keep Meadows North.[12] He used Sherwood Trust to buy Meadows North, but not in a manner calculated to deprive creditors of the value of either Meadows North (which otherwise would have gone to NCNB) or Star Mountain Ranch (which stayed in Sullivan's estate except for the portion pledged to Ishida). The evidence does suggest that Mr. Sullivan may have intended to prefer Ishida over his other creditors by giving Ishida the mortgage on Star Mountain Ranch. Intent to prefer a particular creditor does not, however, necessarily mean that intent to defraud exists. *See Steinmetz v. Sorokin (Matter of Beechwood Medicenter of Flint, Inc.)*, 23 B.R. 939, 943 (Bankr.E.D.Mich.1982). Therefore, the Trustee may not avoid Ishida's lien on the proceeds of Star Mountain Ranch on an actual fraud theory under 11 U.S.C. § 548(a)(1) or § 24.005(a)(1) of the Texas Business and Commerce Code.

*Constructive fraud: 11 U.S.C. § 548(a)(2)*

Even if the Trustee cannot show that Mr. Sullivan actually intended to hinder, delay, or defraud creditors, the Ishida transaction may be constructively fraudulent if Mr. Sullivan received less than reasonably equivalent value and was insolvent at the time of the transfer.[13]

■ *Reasonably equivalent value.*—The Fifth Circuit has expressed some doubt regarding whether the determination of reasonably equivalent value is a question of fact or of law, but "[i]n the usual case, a court must base its determination upon subsidiary fact findings regarding the value of the property transferred and the 'value' received in exchange." *Besing v. Hawthorne (Matter of Besing)*, 981 F.2d 1488, 1494–95 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993). The Court must focus on the net effect of the transfer on Mr. Sullivan's estate and on the amount of funds available to unsecured creditors. "As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred." *Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 484 (4th Cir.1992). There need not be a dollar-for-dollar exchange to satisfy the reasonable equivalence test; rather, the Court should simply compare "the value of what went out [of the debtor's estate] with the value of what came in." *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (Bankr.N.D.Tex.1992) (Felsenthal, B.J.).

■ In the Ishida transaction, what went out of Mr. Sullivan's estate was a security interest in Star Mountain Ranch to secure a $400,000 loan, plus Mr. Sullivan's personal guaranty. Assuming Mr. Sullivan was insolvent at the time of the transfer, the Court values the guaranty at zero.[14] Since the

---

**12.** The Trustee actually stipulated that "Originally, John Sullivan personally desired to acquire the Meadows North property."

**13.** 11 U.S.C. § 548(a)(2)(A) and –(B)(i); Tex.Bus. & Com.Code § 24.006(a). The Trustee presented no evidence regarding unreasonably small capital [11 U.S.C. § 548(a)(2)(B)(ii); Tex.Bus. & Com. Code § 24.005(a)(2)(A)] or ability to pay debts as

they became due [11 U.S.C. § 548(a)(2)(B)(iii); Tex.Bus. & Com.Code § 24.005(a)(2)(B)].

**14.** If Mr. Sullivan were *not* insolvent at the time of the transfer, the question of reasonably equivalent value would be moot; the Trustee would lose his case under 11 U.S.C. § 548(a)(2)(B)(i) and Tex.Bus. & Com.Code § 24.006(a). *See* note 13, *supra* (insolvency was the only constructive fraud

782

ranch property vastly oversecured the Ishida loan, the first lien granted to Ishida was worth the amount of the underlying debt, or $400,000 in August 1990.

What went into Mr. Sullivan's estate as a result of the transfer is slightly more problematic. Mr. Sullivan never received any portion of the funds Ishida loaned to Sherwood Trust; nor did Mr. Sullivan receive any portion of Meadows North, which is still held by Sherwood Trust. However, Ishida argues that Mr. Sullivan and his estate received other forms of "value" in exchange for the Star Mountain Ranch lien.

First, Ishida argues, Mr. Sullivan received an Accommodation Fee consisting of Sherwood Trust's promise to pay Mr. Sullivan $50,000 if Sherwood Trust ever sold Meadows North. The Court finds that, at the time of the Ishida transaction in 1990, the Accommodation Fee had a present value approaching zero, since Sherwood Trust undertook no obligation to *ever* sell Meadows North.

Second, Mr. Sullivan received indemnity from Sherwood Trust on his guaranty of the Ishida loan.[15] Mr. Sullivan's guaranty has been valued at zero, so the value of Sherwood Trust's indemnity for amounts potentially paid under the guaranty is also zero. Moreover, the value of any indemnity from Sherwood Trust was questionable in August 1990. The trust had been funded, five months prior to the Ishida transaction, with only $5,000 cash and a $5,000 note from the settlor, Walter Sullivan (John Sullivan's father).

Third, the transaction had the effect of releasing Mr. Sullivan from his potential liability on the NCNB debt secured by Meadows North. Ishida argues that, if NCNB had bought Meadows North for only 70% of the appraised value at the foreclosure sale, Mr. Sullivan would have been liable under his guaranty for NCNB's deficiency claim in the amount of at least $480,000.[16] However, Ishida produced absolutely no evidence at trial regarding what NCNB was planning to bid at the foreclosure sale or whether the NCNB debt was undersecured or oversecured by the value of Meadows North. Depending on the value of Meadows North in August 1990, there may have been no potential deficiency at all.[17] Ishida has therefore failed to rebut the Trustee's showing that Mr. Sullivan received *no* value in exchange for his transfer of a security interest in Star Mountain Ranch worth $400,000.

■ *Insolvency.*—Since Mr. Sullivan received less than a reasonably equivalent value in exchange for the transfer of the Star Mountain Ranch lien to Ishida, the Trustee may avoid the lien if Mr. Sullivan was insolvent at the time of the transfer.[18] The Bankruptcy Code defines "insolvent," with reference to an individual, as "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of [property that was fraudulently transferred or exempt property]." 11 U.S.C. § 101(32)(A). The issue of the debtor's insolvency is a question of fact. *Join–In International (U.S.A.) Limited v. New York Wholesale Distributors Corp. (In*

theory on which the Trustee presented evidence at trial).

15. A letter agreement between Mr. Sullivan and Mr. Howard as trustee of the Sherwood Trust, dated August 3, 1990, provided: "In consideration for your [Mr. Sullivan's] guarantee I [Mr. Howard] agree, as Trustee of the Sherwood Trust, to the following: * * * 3. Should you make payments on either the $400,000 loan from T. Ishida U.S.A., Inc., or the $1,400,000 loan from National Realty Advisors, I agree that you are to be subrogated to all rights of the respective lender [sic] against the trust and its property." There is no evidence that Mr. Sullivan ever guaranteed the loan made by National Realty Advisors.

16. The parties stipulated that "No appraisals were performed of the Meadows North property

at any time near the date of the foreclosure sale." Therefore, the Court cannot determine how Ishida calculated what the potential deficiency claim against Mr. Sullivan might have been.

17. Mr. Sullivan did testify that he set up the purchase of Meadows North for his family trust because he thought it was a "good investment" for the trust. The inference by the Court is that, in Mr. Sullivan's opinion as an experienced real estate developer and investor, Meadows North was worth at least the $1,643,400 that Sherwood Trust paid for it at the foreclosure sale. If he was right, NCNB was fully secured or oversecured.

18. *See* note 13, *supra.*

*re Join–In International (U.S.A.) Limited),* 56 B.R. 555, 560 (Bankr.S.D.N.Y.1986). The Court may find insolvency if the plaintiff shows the debtor was insolvent " 'proximately before or immediately after the time of [the] transfer.' " *Id.,* quoting *Inland Security Company, Inc. v. Estate of Kirshner,* 382 F.Supp. 338, 344–45 (W.D.Mo.1974). However, the debtor's own balance sheets are not conclusive on the issue of insolvency, and values shown therein should be adjusted in light of testimony presented at trial. *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.),* 103 B.R. 610, 621 (Bankr.E.D.Pa.), *aff'd,* 121 B.R. 442 (E.D.Pa.1989).

■ To show that Mr. Sullivan was insolvent at the time of the transfer, the Trustee points to evidence that Mr. Sullivan was insolvent both six months *before* and six months *after* the August 1990 transfer. Mr. Sullivan's "Compiled Statement of Financial Condition," dated January 31, 1990 ("1990 Financials"), includes a balance sheet showing assets of $74.8 million and liabilities and potential capital gains taxes of $143.7 million. On March 5, 1991, Mr. Sullivan filed his original schedules in the Chapter 11 case ("Original Schedules"). The Original Schedules showed property worth $58.3 million and debts of $185.5 million as of the date of filing, February 1, 1991.

Ishida contests the validity of the 1990 Financials on the ground that they do not reflect Mr. Sullivan's assets and liabilities at a "fair valuation" as required by 11 U.S.C. § 101(32). Specifically, Ishida argues that the 1990 Financials both (a) reflect artificially low values for Mr. Sullivan's real estate holdings and for certain lawsuits in which Mr. Sullivan was a plaintiff or potential plaintiff and (b) overstate liabilities because they include nonrecourse debt on much of the real estate. However, Note 2 to the 1990 Financials explains that the real estate was valued at ad valorem taxing authorities' appraised values or "the loan amounts of the properties." Ishida offered no evidence to show why the tax appraisals might have been low or why, in the generally declining Dallas real estate markets of the late 1980s and early

1990, "the loan amounts of the properties" would yield understated property values. The parties stipulated that Mr. Sullivan, "through his internal accounting department," prepared the 1990 Financials. According to Note 2, Mr. Sullivan's own "internal accounting department" felt that the statements "reflect[ed] estimated current values" in January 1990. Mr. Sullivan also testified that the 1990 Financials did not reflect the value of certain legal causes of action that he owned at the time, but Mr. Sullivan could provide only speculative descriptions of the nature and value of those causes of action. Finally, nonrecourse debt *should* be included in an individual's balance sheet for purposes of 11 U.S.C. §§ 548(a)(2)(B)(i) and 101(32). The business reality is that nonrecourse debt, if secured by the debtor's assets, offsets the realizable values of those assets and therefore directly affects solvency. *See Covey v. Commercial National Bank of Peoria,* 960 F.2d 657, 660 (7th Cir.1992) (Easterbrook, J.) ("To decide whether a firm is insolvent within the meaning of § 548(a)(2)(B)(i), a court should ask: What would a buyer be willing to pay for the debtor's entire package of assets and liabilities? If the price is positive, the firm is solvent; if negative, insolvent."). The Court finds that the 1990 Financials provide a reasonably accurate picture of Mr. Sullivan's financial condition in January 1990.

As for the Original Schedules, Ishida points out that, on June 23, 1993 (*after* the Trustee filed this Adversary), Mr. Sullivan amended his schedules to reflect assets of $234.6 million and liabilities of $185.5 million. This amendment drastically alters the Original Schedules by adding about $176 million in assets. Most of that additional asset value consists of lawsuits against Mr. Sullivan's lenders, which Mr. Sullivan valued in his amended schedules highly enough to completely offset the lenders' claims "based on assumption of mutual release." Amended Schedule B–20. Again, however, at trial Ishida failed to present any evidence of the actual merits of these lawsuits.[19] The Court

---

**19.** Mr. Sullivan testified repeatedly that one particular lender, BancBoston, had signed a settle-    ment agreement with Mr. Sullivan prepetition whereby BancBoston was bound to release Mr.

finds that the Original Schedules, signed by Mr. Sullivan under oath and much closer to the date they were meant to reflect, present the most realistic estimate of Mr. Sullivan's assets and liabilities as of February 1991. *See Mitchell v. Western Data Processing Services Corp.,* 75 B.R. 825, 828 (D.P.R.1987) ("We find that it was not improper for the Bankruptcy Court, in order to assess debtor's economic condition, to take into consideration the schedules and statements of affairs filed by the debtor in the bankruptcy proceedings").

The Court finds itself, then, with credible evidence that Mr. Sullivan was hugely insolvent both six months before and six months after the transaction in question.

> Where there is clear proof of insolvency on a given date and no subsequent financial change, the courts are prone to find that the Debtor was also insolvent on the earlier date at issue. Furthermore, the usual presumption is that a known condition will continue to exist under similar circumstances for a reasonable time.

*Kleinfeld v. Nacol (Matter of Nacol),* 36 B.R. 566, 568 (Bankr.M.D.Fla.1983) (citations omitted).

The Court has found one reported case in which a court considered whether six-month-old financial information could be probative of a debtor's insolvency in a fraudulent-transfer context. In *War Eagle Floats, Inc. v. Travis (In re War Eagle Floats, Inc.),* 104 B.R. 398 (Bankr.E.D.Okla.1989), the late Judge James Ryan wrote:

> Since the sale took place on June 13, 1988, the information provided in the Schedules [showing insolvency on December 31, 1987] is insufficiently contemporaneous with the time of the transfer to demonstrate with any accuracy the insolvency of the corporation. To decide otherwise would not recognize the practicality of the business world and the cyclical nature of the business in which the Debtor was engaged.

Six months is simply too long a period considering the strict requirements of § 548(a)(2) specifically necessitating evidence of insolvency on the date of the transfer at issue.

*Id.* at 400. *War Eagle Floats,* however, is highly distinguishable from this case. War Eagle Floats, Inc., was in the seasonal business of renting canoes for float trips down the Illinois River as part of an outdoor-recreation resort in Tahlequah, Oklahoma.[20] Under those circumstances it is not surprising that Judge Ryan did not find a December balance sheet to be probative of the debtor's insolvency in June.

Ishida failed to rebut the Trustee's showings of insolvency before and after the transfer with any evidence that Mr. Sullivan's business was "cyclical." Ishida offered no reason why Mr. Sullivan's financial condition might have drastically improved between January 1990 and August 1990, or drastically worsened between August 1990 and February 1991. Mr. Sullivan himself testified that he had no idea what his balance sheet might have looked like on August 3, 1990, and he refused to "speculate" about any significant changes that might have occurred between January 1990 and February 1991. Mr. Sullivan's business was real estate development and investment—not an extraordinarily cyclical business on a month-by-month basis. During 1990 Mr. Sullivan was heavily engaged in litigation with his lenders and other parties. The Original Schedules show that Mr. Sullivan was involved in 11 lawsuits pending as of February 1, 1991; some of the lawsuits' case numbers indicate that they had been pending since 1987. The inevitable financial stress associated with such continual, unresolved litigation reinforces the Court's doubts (absent rebuttal from Ishida) that Mr. Sullivan's balance sheet was improving by tens of millions of dollars during any part of calendar 1990.

---

Sullivan from a $15 million liability. Even if the Court accepted this evidence as admissible despite Federal Rule of Evidence 1002, the release of a $15 million liability would by no means render Mr. Sullivan solvent at a time when his total liabilities exceeded his assets by $127 million (according to the Original Schedules).

**20.** The published opinion in *War Eagle Floats* does not describe the debtor's business. The Court's information in that regard was obtained by the Court's law clerk from the debtor's attorney, Ron Wright of Muskogee, Oklahoma.

Mr. Sullivan's own documents, either prepared by his agents or reviewed and signed by Mr. Sullivan himself, indicate that his liabilities exceeded his assets by $64.0 million in March 1989 (Plaintiff's Exhibit 5), $68.9 million in January 1990 (the 1990 Financials), and $127.2 million in February 1991 (the Original Schedules). The Court finds these figures to be *prima facie* evidence of Mr. Sullivan's ongoing and worsening insolvency in August 1990, further supported by evidence of Mr. Sullivan's legal troubles and unrebutted by Ishida.

### Conclusion

The Trustee has failed to show that Mr. Sullivan transferred the Star Mountain Ranch lien to Ishida with actual intent to hinder, delay, or defraud creditors. The Trustee has, however, proven by a preponderance of the evidence that Mr. Sullivan received less than a reasonably equivalent value for the transfer and was insolvent on the date the transfer was made. Therefore, the Trustee may avoid the lien to Ishida under 11 U.S.C. § 548(a)(2)(B).[21]

A judgment consistent with this Memorandum Opinion shall be entered immediately.

---

**21.** This conclusion affords the Trustee all the relief to which he is entitled and makes this Court's analysis of the Trustee's claim under 11 U.S.C. § 544(b) and Tex.Bus. & Com.Code § 24.-006(a) unnecessary.